```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT


TRACY ROLFE,                    :
                                :
     Plaintiff,                 :
                                :
V.                              :    CASE No. 3:10-cv-80(RNC)
                                :
LAWRENCE & MEMORIAL HOSPITAL,   :
                                :
     Defendant.                 :
```

RULING AND ORDER

Plaintiff Tracy Rolfe brings this action against her former employer, Lawrence & Memorial Hospital, alleging retaliation in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, *et seq.*, retaliation against protected speech on a matter of public concern in violation of Connecticut General Statutes §31-51q, and a state law tort claim of intentional infliction of emotional distress.  The Hospital has moved for summary judgment, arguing that plaintiff has failed to bring forward evidence sufficient to raise a genuine issue of material fact in support of her claims.  For reasons that follow, the motion for summary judgment is granted as to the retaliation claim under the ADA.  Because plaintiff fails to raise a genuine issue of material fact in support of the federal claim, the Court declines to exercise supplemental jurisdiction over the state law claims.

I. Background

     The following facts are either undisputed or, where disputed, taken in the light most favorable to the plaintiff.

     *A.  The Admissions Nurse Position*

     Plaintiff was employed by the Hospital as a registered nurse beginning in 1998.  She was diagnosed with MS in or about

September 2004, and placed on FMLA medical leave due to debilitating symptoms including partial paralysis and blindness. When the symptoms decreased, plaintiff returned to work, first part-time under a special modified duty job description, then full-time as a "Registered Nurse- Admissions Nurse" in August 2006. This full-time position was a relatively new one, previously held by only one other employee for a short time, and plaintiff claims she chose it after being refused the less physically onerous positions of case manager and nurse educator. Plaintiff claims that when she returned to work, she continued to be limited in her ability to walk and wore a brace, though it is undisputed that she returned to work "full duty" with no medical restrictions. Plaintiff was adamant about her full duty status and never asked her doctor for a note restricting her duty. See Pl.'s Dep. (ECF No. 71-2) at 54.

A job description of the admissions nurse position, dated March 20, 2006, states that the admissions nurse "[m]ay function as a staff nurse," and is responsible for "[p]erform[ing] other duties as assigned or directed to ensure smooth operation of the unit." See ECF No. 71-11. Attached to the job description is a form entitled "ADA Requirements," which lists the job-specific functions that "applicants, as well as position incumbents who become disabled, must be able to perform . . . either unaided or with the assistance of a reasonable accommodation. . . ." Id. Among the listed requirements are occasional sitting; frequent pushing, pulling, or lifting over 100 lbs; and continuous standing, walking, bending, climbing, kneeling, crouching, twisting, balancing and reaching. Id.

As described by Nancy Robbins, the Assistant Director of Nursing ("ADN"), plaintiff's job was basically to "follow the admissions to wherever they went and complete their admissions paperwork." ECF No. 71-13 at 35. "[I]f there were

not a great number of admissions . . . the ADN would find other work within the job description for the individual to do."  Id. As an admissions nurse, plaintiff was a member of the "float pool," a group of nurses available for assignments on an ad hoc basis to assist in times of heavy workloads.  Plaintiff has testified that when she first began work as an admissions nurse in 2006, she knew that she would be part of the float pool and that her job would require "helping hands" work on other units. Helping hands refers to the practice of sending a nurse to a busy unit for a short period of time to provide assistance to regular staff nurses.  Plaintiff testified that she never had a problem performing helping hands work in the overflow unit, an eight-bed area where the least critical patients were sent if other areas were crowded.

    B.  *The MS Employer of the Year Email*

    Plaintiff's claims arise out of an August 27, 2007 email sent to her by Pat Orce, the nurse manager of the float pool.  In the email, Orce, who was actively involved in MS patient care and support groups at the Hospital, asked for plaintiff's thoughts on nominating the Hospital for "MS Employer of the Year."  Plaintiff concedes that Orce had good intent when she sent the email, but plaintiff did not think the Hospital deserved to be nominated because she did not feel the Hospital had been sufficiently supportive of her efforts to return to work following her FMLA medical leave.  In response to the email, plaintiff went to Orce's floor to speak with her, but Orce wasn't there.  Plaintiff then spoke with her friend and colleague Deb Merola, a clinical coordinator, and voiced her opinion that the Hospital was not deserving of the award and that she couldn't believe she was being asked to nominate the Hospital.  The next day, plaintiff sent Orce an email stating "Honestly, I'm speechless.  I will discuss this with you later."  Subsequently, Orce called

plaintiff and said something to the effect of "Now that you've spent 30 minutes bitching to Deb, I get it." Orce informed Fran Bonardi, her vice president, that she was going to drop any further action in relation to the MS Employer of the Year and explained that the plaintiff "feels the hospital made no accommodation for her at all". Bonardi responded: "I am sooo sorry that she feels this way" and wondered if she should talk to plaintiff because "I really don't think that we should allow her to operate under such a false impression." Orce replied that although the Hospital had accommodated plaintiff, the plaintiff disagreed, and Orce wondered if "maybe I haven't gone far enough to help her out, . . ." Emails- Aug. 31, 2007-Sept. 4, 2007 (ECF No. 71-16) at 2.

    *C. The Alleged Retaliation*

In the summer of 2007, shortly before the MS Employer of the Year incident, Nancy Robbins became the ADN in charge of the staffing office, the float pool, and the daily operations of moving patients. When Robbins took over as ADN, there were three nurses specifically responsible for handling admissions to the hospital: plaintiff and two staff nurses hired around the same time as plaintiff to add workers to the float pool, Tracy Burleigh and Ross Gardels. Initially, these employees spent most of their time in the Emergency Department ("ED"), where most patients were admitted, but also served as helping hands on different units, such as the overflow unit. At the time Robbins started her job, in about June 2007, the Hospital wanted to reduce the waiting time spent by patients in the ED. Robbins began to work on a process for moving new patients from the ED to their beds in appropriate units more quickly and completing admissions on the units, a program called "Patient Express." Robbins testified that a team of about twelve ED nurses, physicians and administrators met approximately eight times to

plan this transition. The team did not include the nurses involved in admissions, and plaintiff did not know there was such a team. As a result of the transition to the Patient Express program, plaintiff, Burleigh and Gardels spent less time doing admissions in the ED, more time doing admissions in other units of the hospital, and more time performing other duties outside the ED.

Plaintiff claims that these new assignments were implemented as retaliation for her response to the MS Employer of the Year email. She claims that her work conditions "drastically changed" as of October 2007, Pl.'s Testimony (ECF No. 71-3) at 102, and she pinpoints the change in duties as beginning when she was required to fill out logs about the location and number of admissions completed per shift. The order to have admission nurses keep logs was sent in an email to Pat Orce and Nancy Robbins by Kathy Kenyon, the Hospital's Director of Inpatient Services. See ECF No. 71-17. Plaintiff admits that admissions nurses as a group were required to fill out admissions logs, and admits that asking her to fill out the logs had nothing to do with her MS or with her complaint about the MS Employer of the Year Email. See Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶ 122.

Under the new process, the plaintiff was required to check in with Robbins and the staffing office daily before she reported to work, which she had not been required to do previously, and Robbins began to assign her "to float to various hospital units to work as a staff nurse for most of her shift, to work on nursing units as 'helping hands,' or to do admissions on units rather than in the Emergency Department." Compl. ¶ 25. Plaintiff claims that sending her to other units to complete admissions was retaliatory because the shifts were longer and required more standing or walking, leaving the patient exhausted and in pain. Plaintiff has testified that she took the

admissions nurse job with the understanding that she would be based in the ED, where she could perform most of her duties seated, and that her floating duties as a staff nurse were supposed to be limited to the overflow unit. Although plaintiff had returned to work full-duty with no restrictions, she claims she took the job only after consultation with the Hospital about finding a position consistent with her limited ability to walk. From the time she returned to work in August 2006 until October 2007, plaintiff was not assigned to work on the units as a staff nurse, although she was occasionally assigned as "helping hands" on other units for no more than a few hours. She estimates that, prior to the implementation of the Patient Express program, 90% of her daily duties consisted of sedentary work doing admissions in the ED. Plaintiff admits that she has no idea whether Pat Orce was involved in the change in her duties, nor does she know whether Nancy Robbins was involved. See Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶ 104-105. Plaintiff further admits that she cannot connect Nancy Robbins and her job assignments to the incidents involving the MS Employer of the Year email. See Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶ 106.

Plaintiff did not adjust well to the changes to her shift assignments. She complained about the changes in emails to Orce and refused to take assignments, failed to report to units, and did not complete certain admission forms, explaining that she was an admissions nurse based in the ED and that she was not required to float to other floors to do admissions. Orce reminded plaintiff that she was not based in the ED and that "when you were hired I was clear you would need to be able to meet all the aspects of the Float Pool job description and you fought very hard to have yourself cleared to return to full duty." Emails-Oct. 30, 2007-Nov. 2, 2007 (ECF No. 71-19) at 10. On November 1, 2007, plaintiff's union representative notified the Hospital that

it was filing a grievance based on the Hospital's discriminatory treatment of the plaintiff.

On November 9, 2007, Robbins saw plaintiff using a cane at work.  She told plaintiff that, due to the occupational hazards presented by using a cane, plaintiff needed to be cleared by Employee Health.  Plaintiff agreed to see Dr. Ruffa, the Hospital's medical director of occupational health.  At the meeting, plaintiff and Dr. Ruffa discussed the admissions nurse job description.  Dr. Ruffa then spoke with plaintiff's treating physician, Dr. O'Keefe.  Dr. O'Keefe told Dr. Ruffa that plaintiff could tolerate the duties listed in the job description, with the exception of running.  The Hospital adopted Dr. O'Keefe's recommendation of a "no running" restriction as of November 12, 2007.  This was acceptable to plaintiff.  The units were informed of this restriction, and Robbins made it clear that there always had to be another RN on the floor with plaintiff in case of emergency because plaintiff was not allowed to run.  In spite of Dr. O'Keefe's clearance to do everything but run, plaintiff continued to refuse assignments.  She also refused to move her belongings from a locker in the ED to the float pool lounge.  When Robbins tried to discuss these issues with plaintiff, plaintiff said she did not have to listen to Robbins, began recording the conversation, and stated that she wanted her union.

Plaintiff received a warning on March 20, 2008 based on her failure to report to a unit to do admissions, her refusal to move her locker, and unprofessional conduct.  This warning was later reduced to a non-disciplinary coaching through an arbitration settlement.  On March 27, 2008, plaintiff voluntarily accepted a transfer to a 24-hour per week position on the orthopedic unit. Plaintiff claims she was forced to take the position because she was unable to continue to perform the duties of her full-time

position as they had been altered by the Hospital.  Even so, plaintiff claims the duties of this new position were more physically strenuous than those of her pre-retaliation admissions nurse position.  In July 2008, plaintiff applied for, but was denied, transfer to an open position that would have been consistent with her physical limitations.  In April 2009, she left the unit on FMLA leave.  When this expired in July 2009, the Hospital terminated the plaintiff's employment.  After exhausting her administrative remedies, the plaintiff filed this action.

II. Summary Judgment

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). In seeking summary judgment, a defendant has the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  To overcome this showing, a plaintiff must point to evidence that would permit a jury to return a verdict in his favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In the absence of such a showing, summary judgment is proper, even in a discrimination case.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(salutary purposes of summary judgment apply no less to discrimination cases than to other areas of litigation).  In determining whether summary judgment is proper, the record must be viewed in the light most favorable to the plaintiff.  See Sheppard v. Beerman, 317 F.3d 351, 354 (2d Cir. 2003).  This requires the court to resolve all ambiguities and draw all permissible inferences in favor of the plaintiff.  See Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997). However, conclusory allegations, conjecture, and speculation are insufficient to

8

create a genuine issue of fact for trial.  Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

III. Discussion

   *A. ADA Retaliation Claim*

   Claims for retaliation under the ADA are analyzed under the same burden-shifting framework established for Title VII cases. Noel v. BNY-Mellon Corp., No. 11-4478-CV, 2013 WL 978725 (2d Cir. Mar. 14, 2013).

   *i. Plaintiff's Prima Facie Case*

   A prima facie ADA retaliation claim requires a showing that "(1) the plaintiff engaged in protected activity, (2) the employer knew of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action."  Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 89 (D. Conn. 2006) (citing Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)).

   Protected Activity and Employer Knowledge

   Not all forms of protest are protected by the ADA's prohibition on retaliation.  Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000).  "Protected activity" refers only to action taken to protest or oppose statutorily prohibited conduct.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  Thus, complaints that are not directed at an unlawful employment practice do not constitute protected activity to establish a prima facie case of retaliation.  See Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 135 (2d Cir. 1999) ("Wimmer's claim of retaliation is not cognizable under Title VII because his opposition [opposing discrimination by co-employees against non-employees] was not

9

directed at an unlawful *employment practice* of his employer."); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 594 (2d Cir. 1988) ("[A]ppellant's complaints about Columbia's selection process for the new . . . position were directed at something that, as it was alleged [selecting a white woman from a pool of candidates that included several black individuals, without more], is not properly within the definition of an unlawful employment practice."). While a plaintiff need not establish that the conduct she opposed was actually a violation of the ADA, she must have "possessed a good faith, reasonable belief that the underlying employment practice was unlawful under the statute." Wimes v. Health, 157 F. App'x 327, 328 (2d Cir. 2005).

Here, plaintiff has not identified evidence from which it could be inferred that she engaged in protected activity. Plaintiff's theory is that "by refusing and making known her refusal to nominate the defendant for an Employer of the Year award and stating her reasons for such refusal to the defendant . . . the plaintiff opposed a discriminatory practice of the defendant." Compl. ¶ 48. However, she does not point to evidence showing that she objected to the Employer of the Year email because she believed the Hospital was unlawfully discriminating against her. In her deposition taken February 4, 2011, plaintiff testified that her sole reason for refusing to nominate the Hospital was "[her] belief that [she] had been treated very badly by [the Hospital] when [she] attempted to return to work from [her] MS related leave of absence." Pl.'s Dep. (ECF No. 71-2) at 166. Plaintiff also stated in her deposition that "to be considered for MS employer of the year, I mean, you have to do something special or even -- or that somebody would consider special, and, you know, that just wasn't the case." Id. at 150-52. Plaintiff had ample opportunity to

10

state that she opposed nominating the Hospital for Employer of the Year because she believed the Hospital had violated the ADA, but she did not.  Plaintiff did include with her opposition to the motion for summary judgment an affidavit stating that because she "receiv[ed] very little help or support from the Lawrence & Memorial administration [in returning from MS] . . . it seemed incredibly inappropriate that [the] hospital . . . would be nominated for MS Employer of the Year."  Pl.'s Aff. (ECF No. 77-1) at ¶ 10.  She also stated that she "felt this would send a very false impression to the general public and to other people with MS and their families."  Id.  The Hospital argues that this affidavit should not be credited because it conflicts with plaintiff's deposition testimony that the only reason she opposed the nomination was because she had been "treated very badly."  Even crediting the affidavit, however, it falls short of showing that plaintiff, in opposing nominating the Hospital for MS Employer of the Year, possessed a good faith, reasonable belief that she was opposing an employment practice that violated the ADA.

   Nevertheless, in determining whether summary judgment is appropriate, the Court must view the record in the light most favorable to plaintiff, see Sheppard v. Beerman, 317 F.3d 351, 354 (2d Cir. 2003), and draw all permissible inferences in her favor, see Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997).  Review of the record discloses an email exchange between Pat Orce and Fran Bonardi in which Orce writes, on August 31, 2007, "[plaintiff] feels the hospital made no accommodation for her at all."  Emails- Aug. 31, 2007-Sept. 4, 2007 (ECF No. 71-16) at 2. In the same email exchange, on September 4, 2007, Orce reiterated: "Tracy feels accommodations are not made for her MS."  Id.  Orce's emails, viewed most favorably to the plaintiff, would permit a reasonable jury to

11

infer that plaintiff had a good faith belief that when she attempted to return to work following her FMLA medical leave, her disability had not been accommodated as required by the ADA. A jury could also find that this belief was reasonable in light of plaintiff's understanding that she had a right to accommodations for her disability and the difficulty that she had returning to work after her MS-related leave. Further, these emails would permit a jury to find that the employer knew that plaintiff was complaining about a violation of her rights under the ADA. Accordingly, these elements of a prima facie case are satisfied.

### Adverse Employment Action

An action is "adverse" for the purpose of establishing a prima facie case of ADA retaliation if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted). While not automatically actionable, reassignment to more arduous duties, even if within the employee's job description, may reasonably be found to be materially adverse. Id. at 71. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal citations omitted).

The plaintiff is not challenging her termination, merely her reassignment to float to other units more often. The Hospital argues that plaintiff's reassignment was not an adverse employment action because "plaintiff was undisputedly on full duty with no job restrictions, under the full-duty admissions nurse job description, which stated that plaintiff 'May function

as a staff nurse' and 'perform other duties as assigned and directed to ensure a smooth operation of the unit.'" Def.'s Mot. Summ. J. (ECF No. 70) at 16.  Thus, the Hospital argues that by requiring plaintiff to float to other units and perform staff nursing duties more frequently, it was merely asking her to do her job.  While this argument has some force, the plaintiff's testimony concerning the change in her assignments would permit a jury to find that the change was materially adverse.

Causation

The causal connection needed for proof of a retaliation claim can be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). Because plaintiff's alleged reassignment occurred roughly a month after she refused to nominate the Hospital for MS Employer of the Year, she has met her burden of establishing an inference of causation sufficient to establish a prima facie case of retaliation.

*ii. Defendant's Legitimate, Non-Retaliatory Reason*

"Once the prima facie case has been made, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment decision." Noel v. BNY-Mellon Corp., No. 11-4478-CV, 2013 WL 978725 (2d Cir. Mar. 14, 2013) (citations omitted).

Here, the Hospital has provided a legitimate, non-retaliatory reason for assigning plaintiff to float to other units and do admissions and staff nurse work there: the Hospital was implementing a new process for admitting patients that involved transferring patients to their units more quickly and

13

processing their admissions there. The Hospital emphasizes the non-retaliatory nature of this change by pointing to the fact that it initiated these changes prior to plaintiff's response to the MS Employer of the Year email.  The Hospital also notes that two other staff nurses who did admissions, Burleigh and Gardels, were also affected by the new process and, just like plaintiff, spent less time doing admissions in the ER and more time doing admissions and serving as helping hands on other units as a result.  In sum, the Hospital argues, "the record is clear that the Hospital was changing staffing in a number of respects, as to a number of employees, for reasons of efficiency and patient care." Def.'s Reply (ECF No. 80) at 12.

### iii. Plaintiff's Showing of Pretext and "But-For" Causation

Once an employer articulates a legitimate, non-retaliatory reason for a challenged employment decision, "the burden shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Noel v. BNY-Mellon Corp., No. 11-4478-CV, 2013 WL 978725 (2d Cir. Mar. 14, 2013) (internal quotations omitted). Temporal proximity alone is insufficient to satisfy this burden. El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010).  Plaintiff also bears the burden of producing sufficient evidence to support a rational finding that but for her protected activity, she would not have been subject to retaliation. Saviano v. Town of Westport, No. 04-CV-522(RNC), 2011 WL 4561184, at *6 (D. Conn. Sept. 30, 2011).  See also Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2534 (2013) (holding that a plaintiff making a retaliation claim under Title VII must establish that "his or her protected activity was a but-for cause of the alleged adverse action by the employer").

As evidence that the new process for admitting patients was pretextual, plaintiff points to the fact that none of the nurses who did admissions was included in the team responsible for developing and implementing the Patient Express program, and to the absence of any of the minutes of the team's meetings. See Pl.'s Opp'n Mem. (ECF No. 76) at 19. This evidence is insufficient to sustain plaintiff's burden.

Plaintiff argues that "there are disputed issues of material fact as to whether Burleigh and Gardels . . . were affected in the same way by the changes that adversely affected [plaintiff]." Id. at 20. According to plaintiff, prior to the changes she spent 90% of her time doing admissions work while Burleigh and Gardels, who were employed as staff nurses, did far fewer admissions, mostly when plaintiff was unavailable. As a result of the changes, plaintiff claims her admissions assignments diminished and she ended up doing more staff work on other units because the admissions work was going to Burleigh and Gardels. See id. If true, these claims could belie the Hospital's argument that the shift reassignments were part of a new, uniformly enforced process. However, plaintiff's responses to the defendant's assertions of fact undermine her argument. In plaintiff's Rule 56(a)(2) statement (ECF No. 77), she admits:

> 155. As time went by and the needs of the hospital changed, plaintiff was asked to function more fully within the job description of the admissions nurse.
>
> 156. At the time when Ms. Robbins was starting her job as ADN, in about June 2007, the Hospital wanted to decrease the time from admission to bed.
>
> 159. The Hospital was making a concerted effort to move people out of the emergency department quickly, and as part of that effort, admissions would be done on the unit more

than in the emergency department. One of the reasons for this transition was space limitations in the Emergency Department.

160. Another reason for the transition was that there were patient satisfaction issues about getting patients out of the Emergency Department.

161. One component of this plan was having admissions done on the patient floors instead of the emergency room. This required having plaintiff, Ms. Burleigh and Mr. Gardels (who also were doing many admissions) go to units for admissions at the bedside.

163. This process was "high on the Hospital's radar."

170. All three of these employees were spending less time on admissions as a result of this process, depending on the Hospital's needs.

Thus, plaintiff admits that the Hospital implemented a new policy that required her to float more often, that they did so for legitimate, non-retaliatory reasons, and that the policy reduced admissions work for Burleigh, Gardels, and plaintiff. In light of these admissions, plaintiff's assertion that Burleigh and Gardels may have done some admissions work that she was available to do while she was assigned to more rigorous work as a staff nurse, viewed in light of the entire record, does not carry her burden of pointing to evidence sufficient to support a finding that the new admissions process was a pretext for retaliation.

Plaintiff alleges that defendants demonstrated animus against her, which may be sufficient to establish a prima facie case of causation, see Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000), but she does not present evidence

16

connecting the alleged animus to her refusal to nominate the Hospital for MS Employer of the Year.  Instead, the evidence she relies on to demonstrate that Orce and Robbins acted with animus pertains to emails sent *after* her duties changed and after she expressed her discontent and her supervisors were receiving complaints about her behavior.  See Pl.'s Opp'n Mem. (ECF No. 76) at 15-16; Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶¶ 180, 182, 184, 185.  Orce's deposition testimony, on which plaintiff further relies to allege animus, similarly relates to Orce's reactions to plaintiff's behavior after she had already been reassigned to more active job duties, after the alleged retaliation had occurred.  Id.  None of plaintiff's allegations of animus suggest that the animus arose as a response to her reaction to the MS Employer of the Year email, much less that her response was a but-for cause of her job reassignment. Even if this evidence were sufficient for plaintiff to establish pretext - for a reasonable jury to infer that the emails demonstrate animus, and that the animus pre-dated the job reassignment such that it motivated the change in plaintiff's duties - this evidence of animus does not suffice to meet plaintiff's burden to show *that her refusal to nominate her employer was a but-for cause of the reassignment*.

Plaintiff has no other evidence that would permit a jury to find that her refusal to nominate the Hospital for MS Employer of the Year was a but-for cause of her new job assignments.  She has no evidence that Pat Orce was involved in her assignment changes or that Nancy Robbins knew about the Employer of the Year email when the assignment changes began.  Pl.'s Testimony (ECF No. 71-3) at 102-103 ("Q: So . . . you can't connect Nancy Robbins and

17

your job assignments to that E-mail at all.  A: True.").[1]
Moreover, although plaintiff alleges that the change in duties began with the log-book requirement, she admits that "[a]sking [her] to fill out logs had nothing to do with her MS, or the alleged complaint about "MS Employer of the Year." Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶ 122.  In light of plaintiff's admission that she cannot connect "plaintiff's own job assignments to the 'MS Employer of the Year' email at all", Pl.'s Rule 56(a)(2) Statement (ECF No. 77) ¶ 106, and her failure to present evidence establishing that her refusal to nominate the Hospital was a but-for cause of her changed job assignments, the claim that the Hospital retaliated in violation of the ADA is unavailing.

    *B.  State Law Claims*

Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if  . . . the district court has dismissed all claims over which it has original jurisdiction."  <u>Munck v. New Haven Sav. Bank</u>, 251 F. Supp. 2d 1078, 1089 (D. Conn. 2003).  Because plaintiff's retaliation claim under the ADA fails as a matter of law, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims of retaliation under Conn. Gen. Stat. §31-51q and intentional infliction of emotional distress.

---

[1] Robbins has testified that she did not become aware of the Employer of the Year issue between plaintiff and Orce until plaintiff filed a grievance in November of 2007, and Orce has testified that the Employer of the Year email was "a nonissue" that "didn't matter to me one way or another" and "had nothing whatsoever to do with [plaintiff's] assignments."  Orce Dep. (ECF No, 71-13).

IV. Conclusion

Accordingly, the defendant's motion for summary judgment [ECF No. 69] is hereby granted. Judgment will enter for the defendant dismissing the ADA retaliation claim with prejudice and dismissing the state law claims without prejudice.

So ordered this 30th day of September 2013.

                                              /s/RNC
                                     Robert N. Chatigny
                            United Stated District Judge